**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| INTERCON CONSTRUCTION, INC., | |
| Plaintiff, | Case No. 18-CV-2081-KEM |
| vs. | |
| TEAM INDUSTRIAL SERVICES, INC., | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT** |
| Defendant. | |

---

## Table of Contents

I.    *FINDINGS OF FACT* ................................................................................................ 2

II.   *CONCLUSIONS OF LAW* ..................................................................................... 19

   A.   *Breach of Contract* ....................................................................................... 20

   B.   *Damages* ........................................................................................................ 24

   C.   *Contractual Indemnification* ....................................................................... 30

III.  *CONCLUSION* ....................................................................................................... 31

Plaintiff InterCon Construction, Inc., brought suit against Defendant TEAM Industrial Services, Inc., for breach of contract and contractual indemnification under Iowa law. Doc. 1. InterCon's claims stem from a procedure performed by TEAM on a natural gas construction project that initially failed, but that TEAM later completed with success. The parties consented to the exercise of jurisdiction by a United States magistrate judge (Doc. 13), and I held a week-long bench trial on the claims. I find for InterCon on the breach-of-contract claim and for TEAM on the contractual indemnification claim and **award InterCon $14,359.01** in damages.

# I. FINDINGS OF FACT[1]

InterCon contracted with Northern Natural Gas Company (NNG) in May 2016 to remove and install underground pipes for natural gas. Doc. 50. The scope of work included a "hot tap and line stop," and InterCon had to secure an NNG-approved company to perform this work. Ex. 1 at 37. Generally speaking, a "hot tap" involves cutting into an active natural gas pipeline, and a "line stop" involves diverting gas from an active gas pipeline to a bypass pipe, so that work can be performed on the now inactive portion of the pipeline without stopping the flow of gas to its destination. *See* Doc. 50.

The contract between NNG and InterCon provided that InterCon would begin construction once NNG issued a "notice to proceed" and that the "substantial completion date" for the work was August 8, 2016. Ex. 1 at 7, 37. Under the contract, InterCon could submit "change orders" for additional payment for delays "solely attributable" to NNG, but NNG would not compensate InterCon for avoidable delays. *Id.* at 15, 35. The contract contained a time-is-of-the-essence clause, generally providing that InterCon would perform the work "regularly, diligently, and uninterruptedly at such rate of progress" to meet the substantial-completion date. *Id.* at 10.

NNG did not issue the notice to proceed until more than a year later, in November 2017. Ex. 36. InterCon informally secured TEAM to perform the hot tap and line stop work around that same time. Ex. 34. InterCon subcontracted the hot tap and line stop

---

[1] After a bench trial, "the court must find the facts specially and state its conclusions of law separately." **Fed. R. Civ. P. 52(a)(1)**. The following findings are based on plaintiff's burden of proving its claims by a preponderance of the evidence. ***Holliday v. Rain & Hail L.L.C.***, 690 N.W.2d 59, 64 (Iowa 2004); *see also* ***Lynch v. Travelers Indem. Co.***, 452 F.2d 1065, 1068 n.2 (8th Cir. 1972) ("In diversity actions, the burden of proof, as a substantive matter, is controlled by state law."). "A preponderance of the evidence is the evidence 'that is more convincing than opposing evidence' or 'more likely true than not true.' It is evidence superior in weight, influence, or force." ***Martinek v. Belmond-Klemme Cmty. Sch. Dist.***, 772 N.W.2d 758, 761 (Iowa 2009) (citations omitted) (quoting *Holliday*, 690 N.W.2d at 63-64).

work to TEAM pursuant to a December 4, 2017 subcontract. Doc. 50;[2] Ex. 5. The subcontract contained a flow-down clause, binding TEAM to the same obligations to NNG in the prime contract as InterCon. Ex. 5 at 1. Both the prime contract and subcontract provided that TEAM's work included a double line stop with bypass piping. Ex.1 at 37; Ex. 5 at 2. The subcontract also noted TEAM's contractual obligations included "[a]ny remedial work necessary or required to bring the Work into compliance with the Contract documents." Ex. 5 at 3. The subcontract did not provide that TEAM had to complete the work in a specific amount of time—indeed, it gave TEAM fifteen "calendar day(s) after notification by [InterCon] to commence its operations." *Id.* at 4. It did state, however, that TEAM had to "completely and satisfactorily perform the Work in accordance with the Schedule, as defined below" (the subcontract did not later define schedule); that TEAM had to perform "in a proper, efficient and workmanlike manner"; that TEAM must "prosecute the Work undertaken in a prompt and diligent manner whenever such Work, or any part of it, becomes available, . . . so as to promote the general progress of the entire construction"; that TEAM must not, "by delay or otherwise, interfere with or hinder the Work of [InterCon]"; and that TEAM "shall proceed diligently with the Work." *Id.* at 2, 4, 10. The subcontract also contained a "time is of the essence" clause and noted TEAM agreed "to pay [InterCon] any actual and direct damage [InterCon] may sustain by reason of such delay by [TEAM]." *Id.* at 4. Both parties contractually waived the right to recover "special, indirect, punitive or consequential damages resulting from or arising out of [the subcontract], including, without limitation, loss of profit or business interruptions including loss or delay of operations, however caused" (this clause was bolded, underlined, and in all caps). *Id.* at 7. The subcontract indicated Iowa law controlled its interpretation. *Id.* at 10.

---

[2] TEAM's factual arguments contrary to the stipulation are not well-taken, and I find them waived.

InterCon started the project on November 13, 2017, after NNG issued the notice to proceed. Ex. 36; Tr. 40-41.[3] InterCon's schedule when the project started provided that TEAM would begin working on December 4 and finish its part of the project on December 11 (with no work on Sunday, December 10).[4] Ex. 34, 87. The schedule provided TEAM with seven working days to complete the hot tap and line stop (TEAM's bid estimated it would need to be on site five days to perform the work). *Id.* When TEAM completed its portion of the work, gas would flow through the new line and the project would be "substantially complete" (meaning the schedule set the substantial completion deadline for December 11). Ex. 87; Tr. 25-26, 91. The schedule set final completion for December 19, 2017, to allow InterCon seven working days to backfill and remove equipment. Ex. 87.

On November 20, 2017, InterCon submitted a change order to NNG, requesting additional payment for three days' worth of work based on "the workspace not being as long as shown on the bid documents." Ex. 42. As a result, the new substantial completion date was December 13, 2017. *Id.* NNG denied the change-order request. *Id.* The next day, InterCon updated the schedule, noting "the bore" took "longer than originally anticipated." Ex. 40; Tr. 24. The new schedule had TEAM onsite from December 7 through December 15 with a substantial completion date of December 15 and final completion date of December 23. Ex. 40. Like the original schedule, the new schedule set out the following work for TEAM:

- Day 1: Set up hot tap equipment;

- Day 2: Perform hot tap;

- Day 3: "Tie-in by-pass to new line" (work performed by InterCon);

<hr/>

[3] "Tr." refers to the trial transcript, filed at Docs. 58-60.

[4] I do not credit testimony from InterCon employees that NNG made it clear from the outset that the project had to be substantially completed by December 22 (Tr. 26-27), nor do I find that TEAM knew at the time of contracting that NNG and InterCon planned a holiday break through the new year if the work was not finished by December 22 (Tr. 338-39).

- Day 4: Perform line stop;
- Day 5: "Tie-in by-pass to old line" (work performed by InterCon);
- Day 6: "Tie-in new line to old line" (work performed by InterCon);
- Day 7: Lift line stop.

Ex. 40, 87. Unlike the original schedule, however, the updated schedule showed a substantial-completion deadline one day after TEAM lifted the line stop, correlating to the removal of the bypass pipeline (work that the original schedule set for the same day as the line stop lift). *Id.* InterCon was responsible for removing the bypass pipeline, but it was connected to TEAM's line stop machine, so it is unclear whether the updated schedule required TEAM to be onsite for an eighth day (the schedule does not set out when TEAM would remove its equipment).

Although the schedule was not formally updated again, on December 4, 2017, InterCon emailed TEAM, asking to push TEAM's start date to December 11 based on "conditions and progress in the field." Ex. 47. TEAM responded they could start December 12. *Id.* On December 7, InterCon pushed TEAM's start date back again, to December 13, "due to water issues." *Id.* The next day, InterCon emailed NNG for permission to work on Sunday, December 10, "[d]ue to the dewatering issue" and to be prepared for TEAM's arrival on site. Ex. 46. NNG granted the request provided that excavation work was completed Saturday, as NNG's field operations team was unavailable Sunday; NNG also noted "Field operations is very upset that Inter[C]on has been requesting [them] on site . . . and is not ready" or organized enough to complete the work. *Id.* Thus, TEAM's start date was pushed from December 4 initially to December 13 through no fault of its own, but rather, delays in InterCon's prep work (excavating, directional drilling, dewatering). Tr. 46-47, 213-14.

TEAM started its work on December 13 (after being on standby for four hours), completing the hot tap on two parts of the pipe (which took eight hours). Doc. 50; Ex. 10; Tr. 145. To begin each hot tap, TEAM attached a sandwich valve to a fitting on the

5

existing pipeline that had been installed by InterCon in the prep work phase. Tr. 110, 218, 578-79. TEAM then bolted the hot tap machine to the sandwich valve. Tr. 582-83. With the sandwich valve open, TEAM used the hot tap machine to cut a hole in the active natural gas pipeline, retract the "coupon" (the circle of pipe that had been cut out), and then close the sandwich valve to prevent gas from escaping into the atmosphere from the new hole. Tr. 110-11, 585-89. TEAM removed the hot tap machine and replaced it with a line stop machine, bolting it to the sandwich valve. *Id.*

The next step was for InterCon to attach the bypass pipeline to the two line stop machines, so that once TEAM performed the line stops (stopping the flow of gas between the two points), the gas could continue to flow to its destination (through the bypass). Tr. 115, 144. Before that could happen, however, the bypass pipeline had to be dried to a dewpoint of negative 40. Tr. 122-23, 146-50. InterCon performed this requisite drying on December 13 (while TEAM performed the hot tap) and 14 (while TEAM was on standby); the original schedule showed drying occurring on the same two days as the hot tap, and the updated schedule set drying for only one day, the day of the hot tap. Ex. 40, 87. After that, InterCon attached the bypass piping to the line stop machines (creating a closed system and preventing moisture from entering the now-dried pipe). *Id.*; Tr. 123-30, 139-42, 149, 154, 227, 646-48; Ex. 6, 7, 10. One step remained before TEAM could start the line stop: NNG had to pressure-test the new bypass pipeline before it was filled with natural gas. Tr. 151-152. NNG had left the worksite after lunchtime on December 14, so NNG performed this work early the next day, on December 15. Ex. 6; Tr. 152. NNG discovered an internal leak in the bypass pipeline caused by two defective valves that had been supplied by NNG. Tr. 154-55. InterCon and TEAM were sent home for the day at 9:00 a.m., as NNG would not receive replacement valves until the next day. Ex. 6, 10. The valves arrived mid-morning on December 16, and InterCon was finished with pressure testing by noon. Tr. 160, 165; Ex. 10. TEAM began performing the line stops around 12:30 p.m. (after being on standby for five hours in the morning). *Id.* The original schedules provided for one day of work between TEAM

6

completing the hot tap and performing the line stop; in actuality, there were two and a half. Ex. 40, 87.

During a line stop, TEAM equalizes the pressure on both sides of the sandwich valve before cranking the sandwich valve open. Tr. 536, 591-95. TEAM then uses the line stop machine to drop a plug the exact diameter of the existing pipeline through the open sandwich valve and hole created during the hot tap, then turns the plug at a right angle to block the flow of gas through the existing pipeline, forcing the gas to flow through the bypass pipeline instead. Tr. 589-90, 595, 599. Once this has been performed on both parts of the pipe, natural gas no longer flows through the portion of the pipe that has been bypassed, allowing it to be replaced with new pipeline (which the schedule estimated would take InterCon two days). Ex. 40, 87. Once the new pipeline is in place, TEAM uses the line stop machine to remove the plug, and it closes the sandwich valve, allowing gas to flow through the new pipeline (and stop flowing through the bypass). At that point, the project is "substantially complete," although work would remain for InterCon (such as backfilling) that the schedule estimated would take seven days and that ended up taking much longer. Tr. 251-54; Ex. 40, 75, 87. Thus, if the line stop work had gone as planned on December 16, the project would have reached substantial completion before the Christmas holiday, but not final completion.

TEAM successfully completed the line stop on the south end of the pipe on December 16, but not on the north end of the pipe. Doc. 50; Tr. 540. On the north end, TEAM opened the sandwich valve and dropped the line stop machine through the opening and down into the pipe. Ex. 6-8. But when attempting to turn the plug on the line stop machine to seal the natural gas pipeline, TEAM could not get the plug into position—it remained about three inches off from sealing. *Id.* TEAM ran the machine back and forth around eight times, trying to jostle the plug into the right position, without any success. *Id.* TEAM then decided to retract the line stop machine and close the sandwich valve so that it could remove the line stop machine and check the plug for issues. *Id.* It closed the sandwich valve, but when bleeding off the gas in the line stop machine, TEAM

Case 6:18-cv-02081-KEM   Document 72   Filed 11/04/22   Page 7 of 31

realized that gas was still coming through from the pipeline—meaning the sandwich valve was not fully sealed as it had been earlier in the day. *Id.*; Ex. 1002. TEAM thought that there might be metal shavings in the sandwich valve, created when cutting the pipe during the hot tap, that were preventing the gate from fully closing. Tr. 172; Ex. 6-8. NNG adjusted the pressure of the gas running through the pipeline to try to blow any shavings out of the way, but it did not help. Tr. 169. At that point, TEAM could not successfully complete the line stop as planned, and it could not remove the line stop machine to troubleshoot without releasing natural gas into the atmosphere. Tr. 172. Thus, the parties realized that they would need to perform another hot tap and line stop upstream, only removing this line stop machine once natural gas was no longer flowing through this portion of the pipe. Ex. 6-8. TEAM worked for three and a half hours on December 16 (meaning it finished troubleshooting mid-afternoon), and InterCon sent the entire crew home at 3:00 p.m. Ex. 7, 10.

An unexpected hot tap and line stop caused additional prep work for InterCon: among other things, InterCon had to excavate more of the pipe, create and dry additional bypass piping, and install a new fitting for a third sandwich valve (which was provided by NNG). *See* Tr. 452; Ex. 78. InterCon performed this additional prep work from Monday, December 18, to 11:00 a.m. on Friday, December 22, 2017. Ex. 6. From Monday to Thursday, the following people worked:

- The foreman worked 40 hours and was paid a salary and benefits working out to $1,475 a day. Ex. 6, 92.
- Two laborers worked 42 hours each (4 days each). Ex. 6. InterCon paid the union steward $24.82 an hour for wages, plus a $110 per diem; InterCon paid the other laborer $21.82 an hour for wages, plus a $45 per diem; and InterCon paid both laborers $9.88 an hour in benefits. Ex. 96. They received time and a half

8

for the two hours worked in excess of 40. In total, InterCon incurred costs of $3,455.44 related to this work.[5]

- Three welders worked or were paid wait time for 85 hours' worth of work (10 days); InterCon paid them a wage and benefits totaling $115 an hour as well as a $135 per diem. Ex. 6, 92. I do not find that they worked any overtime. InterCon's total welder costs were $11,125.[6]

- Three welders' helpers worked or were paid wait time for 95 hours' worth of work (12 days); InterCon paid them a wage and benefits totaling $59 an hour, plus a $62.50 per diem. Ex. 6, 92. I do not find that they worked any overtime. InterCon's total welders' helper costs were $6,355.[7]

- Three machine operators worked all four days. Ex. 6. The union steward worked 44 hours and received wages and benefits totaling $62.82 an hour (based on a wage rate of $37.72 an hour and benefits of $25.10 an hour), as well as a $112 per diem. Ex. 6; Ex. 93 at 5-6; Ex. 97. Another operator also worked 44 hours and received the same wages and benefits, plus a $107 per diem. *Id.* The final operator worked 43 hours and received wages and benefits totaling $51.49 an hour (based on wages of $28.39 an hour and benefits of $23.10 an hour), as well as a $107 per diem. *Id.* They received overtime for the hours they worked in excess of 40. *See* Ex. 93 at 6. In sum, InterCon paid the operators wages and benefits totaling $9,239.70.[8]

---

[5] $24.82x40 + $24.82x1.5x2 + $21.82x40 + $21.82x1.5x2 + $9.88x42x2 + $110x4 + $45x4 = $3,455.55.

[6] $115x85 + $135x10 = $11,125.

[7] $59x95 + $62.50x12 = $6,355.

[8] $62.82x80 + $37.72x1.5x8 + $25.10x8 + $112x4 + $107x8 + $51.49x40 + $28.39x1.5x3 + $23.10x3 = $9,239.70 (rounded to the nearest cent).

9

On Friday, only the foreman and the two laborers worked, and they were done by 11:00 a.m., working for four hours. Tr. 65, 439; Ex. 6. InterCon paid the laborers $513.88 in wages (at the overtime rate) and benefits (including their per diem) for Friday.[9] Even though the welders and their helpers had left the job site after work on Thursday, InterCon was still required to pay them "wait time" equivalent to five hours of work for the welders and four hours of work for their helpers, plus their per diem.[10] Ex. 6, 92. InterCon also had to pay operators a flat "wait time" of $135 a day. Ex. 6, 92. InterCon did not have to pay laborers any wait time, however. Tr. 65; Ex. 92. On days that the crew were sent home early but worked hours earning them the equivalent or greater of their "wait time" rate, InterCon did not pay wait time. Tr. 439.

The project shut down for the Christmas break, with an expected return of Wednesday, January 3, 2018. Tr. 266, 339, 430; Ex. 6, 62. The crew wanted to be home with their families over the holidays, and NNG did not want to risk a gas outage for its customers. *Id.*

The forecast for the week of January 3rd showed it was going to be colder, with highs ranging from 7 to 17 degrees (when working on the project in December, highs were mostly in the 30s and 40s, with a few days in the mid-twenties). Tr. 184; Ex. 106-107. NNG decided to postpone the project until January 8—it worried that lowering gas pressure as needed for the hot tap and line stop would affect its customers during a high-use period caused by the cold weather. *Id.* InterCon submitted a change order to NNG seeking payment for standby costs incurred during this period, since InterCon and TEAM were ready to return to the job site "but unable due to the decision made by NNG." Ex. 64. NNG ultimately denied the change order as not involving "extra work" under the contract. Ex. 75.

---

[9] $24.82x1.5x4 + $110 + $21.82x1.5x4 + $45 + $9.88x8 = $513.88.

[10] I note a change order to NNG indicates that the helpers had to be paid 5 hours' worth of wait time; but the daily log of hours indicates that the helpers only had to be paid for 4 hours' worth of wait time, which I credit. *See* Ex. 6, 92.

The crew returned to the project on January 8, working a full day—meaning that if the project had not stopped for the holidays, InterCon would not have paid the crew wait time on Friday, December 22 (because if the crew had worked that afternoon, they would have worked sufficient hours to not be entitled to wait time). Ex. 6. The first thing upon return was for TEAM to perform the hot tap at the new pipeline location and mount the line stop machine. Ex. 6, 10. Early the next day, TEAM successfully completed the line stop, then went on standby for the rest of the day while InterCon put the new pipe into place. *Id.* TEAM remained on standby on January 10 as InterCon completed its work. *Id.* On January 11, TEAM removed the line stops, allowing gas to flow through the new pipeline (substantial completion). *Id.* TEAM then removed its equipment, being done with its portion of the project. *Id.* It took InterCon through at least January 26 to complete the project (remove bypass piping, backfill, etc.). Tr. 251-54; Ex. 75.

After removing the failed line stop equipment, the parties learned the reason the sandwich valve would not seal: the o-ring in the sandwich valve's gate had been damaged. Tr. 187; Ex. 1002. The o-ring sits in a groove in the gate facing into the line stop machine (and away from the inside of the natural gas pipeline). Tr. 188, 350; Ex. 100. The o-ring allows TEAM to equalize the pressure on both sides of the sandwich valve gate and is also used to vent gas. Tr. 144. When the sandwich valve gate is in the closed position, the o-ring is protected from anything in the pipe (since it faces away from the pipe). Tr. 353. When the sandwich valve is being opened (by cranking the handle), the gate slides horizontally into a housing unit; once the sandwich valve is fully open, the gate is snugly enclosed in the housing unit, and the o-ring is protected from anything in the pipeline. Tr. 539, 562; Ex. 112. Natural gas carrying debris (such as shavings from the hot tap) could potentially damage the o-ring, however, when the gate is in the process of being opened or closed. *See, e.g.*, Tr. 757. Here, the damage to the o-ring was on the part of the gate that enters the housing unit last when opening the sandwich valve (and appears first when closing the sandwich valve). Tr. 352-53; Ex. 100.

After InterCon learned that NNG planned to deny the change order requesting payment for standby time during the first week of January, InterCon emailed TEAM requesting TEAM cover all expenses incurred between December 16, 2017 (when the line stop failed), and January 8, 2018 (when the line stop was completed). Tr. 196; Ex. 69. TEAM responded that it understood that shavings from the hot tap "caused the valves to leak," which "is something . . . beyond our or anyone else[']s control and would not be an equipment failure." Ex. 69. Two employees for InterCon discussed that email internally, noting TEAM's response was "[k]inda funny since there were no [shavings] found anywhere in the vicinity." Ex. 70.

In preliminary meetings between the parties in January and February, InterCon claimed that a problem with the line stop machine caused the line stop failure. Tr. 349-50. InterCon contended that the line stop machine had been making a funny noise during the attempted line stop and that the o-ring had been damaged by the head of the line stop machine when TEAM's technicians moved it back and forth, trying to get the plug to set. *Id.*

TEAM, on the other hand, blamed hot tap shavings and said that its inspection of the line stop machine once the project was over revealed shavings in the machine. Tr. 199, 298-99. Nevertheless, in an effort to resolve the dispute, TEAM offered not to charge InterCon for TEAM's work (contracted for $29,450). Tr. 30, 34, 199, 347; Ex. 5 at 2. InterCon never paid TEAM for its hot tap and line stop work.

In early March, NNG told InterCon it would be withholding $13,119.99 in payment to cover the additional supplies NNG provided (the sandwich valve fitting) when the project necessitated a third hot tap and line stop. Ex. 78. InterCon sent an updated demand to TEAM for $214,349.96, and TEAM indicated its legal team would be handling the dispute going forward. Ex. 79. On March 26, InterCon emailed TEAM indicating that it had not yet heard from the lawyers, and TEAM indicated someone would reach out. Ex. 82, 83.

The next day, March 27, the operations manager for the TEAM project typed out a written statement from the senior TEAM technician, Phillip Britton, who performed the hot taps and line stops for the project. Tr. 388-89; Ex. 84. The statement indicated that Britton heard a "crunching noise" when closing the sandwich valve after the line stop plug failed to set and that when bleeding off gas thereafter, he saw ice come out of the valve (meaning ice was in the pipeline). Ex. 84. The statement indicated that although InterCon "had hydro-tested the [bypass pipeline] prior to installation to [TEAM] equipment[,] . . . some water may have still been in it and got[ten] into the seat of the [sandwich] valve." *Id.* I do not credit this statement in the slightest. The other TEAM technician onsite, Trevor Stotts, did not see ice when bleeding off the gas. Ex. 1002. And more importantly, Britton did not mention hearing a crunching noise or seeing ice until more than three months after-the-fact once TEAM had been threatened with a lawsuit: Britton's observations in the initial TEAM problem report did not include that he heard a crunching noise or saw ice; when discussing what happened onsite with Stotts and InterCon, Britton did not mention seeing ice (and indicated he thought shavings were the problem); and in the preliminary settlement meetings between TEAM and InterCon, TEAM never mentioned ice or suggested that InterCon was at fault. Tr. 31, 173, 193, 202, 302-03, 459; Ex. 1002.

The parties have proffered several theories for what caused the problem. As an initial matter, I note that two separate things occurred here (which may or may not be related): the line stop plug failed to set, and the o-ring in the gate of the sandwich valve was damaged, preventing the sandwich valve from sealing as it had before. There may not be a reason the line stop plug would not set—it happens sometimes; the next step is to remove the line stop machine and check the head of the plug to see if any adjustments should be made (which could not be done here due to the sandwich valve issue). Tr. 400-01. TEAM determined after-the-fact that there was nothing wrong with the line stop machine, and indeed, TEAM put it back in service without any repairs or modifications. Tr. 345. Shavings may also cause a line stop head not to set, and InterCon's expert

13

guessed shavings were to blame (there is no evidence any shavings were found in the pipeline, although InterCon's expert testified that he saw something that could be shavings in the pictures of the pipeline). Tr. 172-73, 246, 402, 639, 683-84, 688. InterCon's expert also noted that if the sandwich valve gate had not been fully opened, it could have affected the head of the line stop machine. Tr. 639-42. But the plug of the line stop machine cannot fit through the sandwich valve gate if it is open even a tiny bit, and the line stop machine made it past the sandwich valve and into the pipe (since the line stop plug was three inches from setting). Tr. 350, 356, 597.

InterCon's expert suggested that the o-ring was damaged by the line stop machine when TEAM moved it back and forth in an attempt to get the plug to set. Tr. 638, 640-41, 688-89. He indicated that attempting to reset the plug eight times (as TEAM had done) was against industry standards and that he would only try two times at most before closing the sandwich valve and removing the line stop machine to examine it (I do note that in TEAM's discredited problem report, Britton indicated they attempted to set the plug five times, as opposed to the eight times indicated in the previous report—perhaps suggesting TEAM thought eight times was too many). *Id.*; Ex. 8, 84. But the line stop machine could not have damaged the o-ring—when trying to set the plug by moving the machine back and forth, TEAM did not retract the machine all the way back past the sandwich valve (where the o-ring is located) and out of the pipe. Tr. 349-50, 401-02, 702. In addition, the o-ring was protected in its housing at that time because the sandwich valve gate was open. Tr. 349-50.

Stotts (one of the TEAM technicians) theorized that prior to opening the sandwich valve, the active natural gas pipeline had not been equalized with the empty bypass pipeline, causing the o-ring to "bubble up" from the groove in the sandwich valve's gate. Ex. 1002. He said he had talked to another technician who agreed with this theory. *Id.* But technicians with more experience than Stotts, including InterCon's expert, testified that it would have been impossible to crank open the sandwich valve gate if the pressure had not been equalized. Tr. 593-94, 626-27; *but see* Ex. 1002. In addition, Britton, the

14

lead TEAM technician, had ten years' experience and had performed several hundred hot taps and line stops before, including on high pressure pipelines. Tr. 572, 574-75. And most of the o-ring was found in the groove where it belonged; only a portion was missing. I do not find it more likely than not that TEAM failed to properly equalize the pressure between the active pipeline and the bypass pipeline before opening the sandwich valve.

Ice or hot tap shavings could have damaged the o-ring when the gate was being opened or closed. Tr. 658, 729, 757. InterCon had dried the bypass pipeline to NNG's strict specifications, making ice an unlikely cause (in opining ice caused the damage, TEAM's expert relied heavily on Britton's discredited report, as well as pictures of the sandwich valve taken more than an hour after the sandwich valve had been exposed to the atmosphere on a snowy day). Shavings seem like the most likely culprit, but ultimately, I find the preponderance of the evidence does not establish what damaged the o-ring (i.e., I do not find that it is more likely true than not true that shavings caused the damage). I further note that TEAM's bid indicated it would not be responsible or liable for any shavings "that may enter any piping system . . . as a result of" its hot tap work. Ex. 30. Shavings from hot taps are unavoidable, and if hot tap shavings damaged the o-ring, it would not show that TEAM violated industry standards in performing the hot tap and line stop. Tr. 323-25.

Ultimately, I find it more likely than not that TEAM followed industry standards for hot taps and line stops in performing the work. I find that TEAM acted reasonably in performing the line stop and that there is nothing TEAM could have done to prevent the damage to the o-ring, resulting in TEAM's inability to troubleshoot the line stop failure. I also find by a preponderance of the evidence that InterCon did not cause the line stop failure or damage to the o-ring.

I do not credit InterCon's prepared exhibit of the costs it incurred the week of December 18 (and over the holiday break), first sent to TEAM as part of a "change order" demanding payment. Ex. 93. There are many inconsistencies, both within the exhibit itself and with other exhibits, and I am cognizant that InterCon prepared this

document in anticipation of litigation.[11]  For example, there are at least two individuals who Exhibit 93 indicates were paid at a higher hourly "straight time" rate the week of December 18 (when InterCon is seeking recovery from TEAM) than the prior week (when InterCon is not).[12]  In addition, for two of the helpers (Austin Laud and Derek Wilson), Exhibit 93 shows many entries inputted for the week of December 18 only to be negated out later, and the remaining entries cannot be reconciled.  As just one example, the foreman's timesheet in Exhibit 93 shows that Laud and Wilson worked 24 hours at their regular rate and received 12 hours of wait time the week of December 18.  Exhibit 93 shows inputs for 24 hours of work at $29.72 an hour (presumably the "standard rate")[13] and 12 hours of work at $28.97 an hour (presumably the "wait time rate"), only for those entries to be negated out and changed to 28 hours of work at the higher rate ($29.72 an hour) and 8 hours of work at the lower rate ($28.97 an hour).  The evidence makes clear that Laud and Wilson were on wait time for 12 hours the week of December 18 (Ex. 6, 93), and yet Exhibit 93 suggests they received different hourly rates for this wait time.  It seems that InterCon changed data in Exhibit 93 after-the-fact to try to gain more money from TEAM, especially since the original entries (that are negated out) are consistent with the wait time the helpers actually worked.

---

[11] To the extent the hours worked in Exhibit 93 conflicts with the hours worked in Exhibit 6, I credit Exhibit 6.

[12] According to Exhibit 93, InterCon paid welder Tyler Raines a straight-time rate of $55.95 an hour the week of December 18, $2 more than the prior week; and it paid machine operator Ray Sandhagen a straight-time rate of $41.05 an hour the week of December 18, but a rate of $37.72 an hour the week prior (according to the union contract with the operators, $37.72 an hour was one of three possible rates InterCon had to pay operators (and the highest of the three) (Ex. 97)). Exhibit 93 calculated Sandhagen's overtime pay for the week of December 18 based on the $37.72 rate, however.

[13] In addition, Exhibit 93 shows overtime paid to Laud and Wilson the week of December 18 at a rate equal to 1.5 times $29.72.

In addition, InterCon's contract with NNG sets out the straight time and overtime rates (at a little more than 1.25%) for each class of employee (including the foreman). Ex. 1 at 47. InterCon's Chief Financial Officer (CFO), who prepared Exhibit 93, explained that Exhibit 93 is inconsistent with the contract because InterCon seeks to recover only its costs from TEAM, versus when NNG is the cause for delay, InterCon receives both costs and profit. Tr. 441, 490-92. But for at least one employee, InterCon sought *more* money in Exhibit 93 for the week of December 18 than it would have received from NNG based on the contract.[14]

Because I do not trust the veracity of the numbers set forth in Exhibit 93, I credit instead the labor costs set out in InterCon's contracts with the laborer and steward union and that appear in a change order to NNG. Ex. 92, 96-97. InterCon's CFO testified that these documents do not include the tax burden (like federal unemployment insurance) to InterCon, nor the cost of insurance. Tr. 443-44. But InterCon has offered no credible evidence of its taxes or insurance. I also find that InterCon has offered no credible evidence—not even testimony—that it paid overtime based on the day, rather than based on the week. *See also* Tr. 214.

---

[14] Exhibit 93 consists of an individualized breakdown of labor costs, including wages, fringe benefits, insurance costs, payroll taxes, and "subsistence" for each employee, further broken down in each category by straight time and overtime costs. InterCon then multiplied its "labor costs" by 12% to account for departmental overhead and the wages of salaried employees like the project manager, who are not included in the labor cost breakdown. Ex. 93 at 3; Tr. 440-41. For the week of December 18, Exhibit 93 indicates that InterCon's labor costs (wages and benefits) totaled $40,778.77 and that its labor costs plus 12% is $44,962.75—which is 10.26% of $40,778.77 (an additional $4,183.98 is also far more than 12% of just the wages—i.e., InterCon must be multiplying some of the fringe benefits or payroll taxes by 12%, but it is unclear to the court how it calculated this number).

For the week of December 18, Exhibit 93 shows $3,066.60 in labor costs (wages and benefits) for welder Tyler Raines, based on 16 hours of standard time and 5 hours of overtime. Using the method set out in InterCon's contract with NNG, however, totals only $2,925.27. Ex. 1 at 47. Thus, even without adding the additional 12% (or 10.26%) to $3,066.60, InterCon would have recovered less from NNG under the contract.

17

InterCon also seeks damages based on additional days of equipment usage. InterCon owned most of the equipment, but it still submitted an exhibit compiling the "costs" associated with that equipment on an hourly basis for the additional days of work the week of December 18. Tr. 448, 493-94; Ex. 94. InterCon sought "standby costs" for equipment that was not used. Ex. 94, 95. InterCon also sought operating costs for equipment at a rate higher than what InterCon contractually received from NNG for additional hours of equipment usage (the rate InterCon charged NNG included "gasoline, oil, grease and other fuel, supplies, repair parts, repair labor, personal property taxes, license fees, rentals, supervision, overhead and profit and all other costs"). Ex. 1 at 46; Ex. 94, 95. InterCon's CFO, who calculated damages, testified that the rates in Exhibits 94 and 95 were InterCon's "standard internal rates" that InterCon charged customers and that it used to determine bids—but if that were the case, the rates would include profit and not just account for InterCon's costs, and the rates would be the same as what InterCon charged NNG (not more). Tr. 441-42. InterCon did not explain how these equipment costs were calculated (i.e., how much additional fuel did InterCon use?) and suggested that the damages were based on InterCon's inability to use the equipment on other projects due to the delay. Tr. 448, 485, 493-96. Like Exhibit 93, I question the veracity of the numbers set forth in Exhibits 94 and 95 (and InterCon offered no other evidence of its owned equipment costs).

InterCon also submitted evidence that it rented an air compressor, mats, and light towers for use on the project. Ex. 94. InterCon rented this equipment on a monthly basis. *Id.* For the air compressor and mats, InterCon's initial rental included the week of December 18. *Id.* InterCon initially rented the air compressor from December 14, 2017, through January 11, 2018, and there is no evidence that InterCon extended the rental. InterCon used mats on the project from the start through demobilization and the final completion date (Tr. 251-54, 451), but it only submitted evidence of the rental cost of the mats for the month of December (Ex. 94). Even without the failed line stop, InterCon would have had to rent the mats for the month of January (as it would not have

18

reached final completion in December). InterCon initially rented the light towers from November 20, 2017, through December 18, 2017, which InterCon then extended through January 15. *Id.* It is unclear what parts of the project required use of the light towers and whether InterCon extended this rental beyond January 15. I do not find InterCon has proved by the preponderance of the evidence that the failed line stop caused it to incur additional costs to rent the light towers (InterCon's own delays are just as likely to blame).

## II.     CONCLUSIONS OF LAW

This diversity action involves a claim under Iowa state law. Federal courts are "bound by the decisions of the [Iowa] Supreme Court regarding issues of substantive state law."[15] "If the [Iowa] Supreme Court has not yet addressed a particular issue, '[the court] may consider relevant state precedent, analogous decisions, considered dicta, and any other reliable data.'"[16] "Decisions from [Iowa's] intermediate appellate court . . . are 'particularly relevant,' and must be followed when they are the best evidence of [Iowa] law."[17]

Breach of contract under Iowa law requires proof of the following elements:

(1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.[18]

Here, a written contract existed between the parties, satisfying the first and second elements. Ex. 1, 5. InterCon performed all its obligations under the contract prior to

---

[15] ***Bockelman v. MCI Worldcom, Inc.***, 403 F.3d 528, 531 (8th Cir. 2005).

[16] ***Id.*** (cleaned up) (quoting ***Bass v. Gen. Motors Corp.***, 150 F.3d 842, 846-47 (8th Cir. 1998)).

[17] ***Id.*** (quoting ***Knouse v. Gen Am. Life. Ins. Co.***, 391 F.3d 907, 911-12 (8th Cir. 2004)).

[18] ***Iowa Mortg. Ctr., L.L.C. v. Baccam***, 841 N.W.2d 107, 110-11 (Iowa 2013) (quoting ***Molo Oil Co. v. River City Ford Truck Sales, Inc.***, 578 N.W.2d 222, 224 (Iowa 1998)).

TEAM's hot tap and line stop work (I found that InterCon adequately dried the bypass pipeline as required by the contract). At issue is whether TEAM breached the contract and InterCon's resulting damages.

### A. Breach of Contract

"A breach of contract is a party's failure, without legal excuse, to perform any promise which forms a whole or a part of the contract."[19] When interpreting a written contract, "the objective is to ascertain the meaning and intention of the parties as expressed in the language used."[20] Words are given their "plain and ordinary meaning."[21] The court may also consider the surrounding circumstances and "the objectives the parties were trying to attain."[22]

InterCon argues that TEAM breached the contract by failing to complete its work by December 22, 2017. InterCon points to a provision in the prime contract making time of the essence in meeting the substantial-completion date (applicable to TEAM through the flow-down provision in the subcontract), as well as a time-is-of-the-essence clause in the subcontract. But there is no evidence that the parties agreed to a substantial-completion deadline of December 22: InterCon's initial contract with NNG provided for

---

[19] *Magnusson Agency v. Pub. Entity Nat'l Co.-Midwest*, 560 N.W.2d 20, 27 (Iowa 1997).

[20] *Mopper v. Circle Key Life Ins. Co.*, 172 N.W.2d 118, 124 (Iowa 1969); *accord First Nat'l Bank in Creston v. Smith*, 331 N.W.2d 120, 122 (Iowa 1983); *Broyles v. Iowa Dep't of Soc. Servs.*, 305 N.W.2d 718, 721-22 (Iowa 1981). "Interpretation, the meaning of contractual words, is an issue [of law] unless it depends on extrinsic evidence or on a choice among reasonable inferences from extrinsic evidence. Construction, the legal effect of a contract, is always a matter of law to be decided by the court." *Connie's Constr. Co. v. Fireman's Fund Ins. Co.*, 227 N.W.2d 207, 210 (Iowa 1975) (citations omitted); *accord Molo Oil*, 578 N.W.2d at 225.

[21] *Mopper*, 172 N.W.2d at 124.

[22] *Molo Oil*, 578 N.W.2d at 225; *accord First Nat'l Bank*, 331 N.W.2d at 122; *Broyles*, 305 N.W.2d at 721; *Lovlie v. Plumb*, 250 N.W.2d 56, 59 (Iowa 1977); *see also* **Iowa Model Civil Jury Instructions § 2400.5**.

a substantial-completion date of August 8, 2016; the schedule when the project started set a substantial-completion deadline of December 11, 2017; and later schedules set substantial-completion deadlines of December 13 and December 15, 2017. These schedules provided that TEAM would begin its work on the project at latest by December 7—and if InterCon had been ready for TEAM to begin its work then, the project would have been substantially completed by the holiday break (even with the line stop issues). InterCon's work on the project caused far more delays than TEAM's work on the project, but InterCon essentially seeks to have TEAM stuck "holding the bag," responsible for costs incurred over the holiday break, since its work occurred at the end of the project. This was not the parties' intent when entering the subcontract.

InterCon points to provisions of both contracts generally requiring that TEAM perform its work promptly, diligently, efficiently, without delay, and in a workmanlike manner. "'A good and workmanlike manner' . . . mean[s] undertaking 'to produce definite and certain results'" and performing the job "'as a skilled workman should do it.'"[23] Here, TEAM followed industry standards and completed the double hot tap and line stop as quickly as possible. TEAM was on the job site and performed its work whenever InterCon requested. Simply because the line stop failed initially—through no fault of TEAM's—does not mean TEAM breached those portions of the contract requiring TEAM work diligently, promptly, and in a workmanlike manner.

Nevertheless, TEAM breached the subcontract when the line stop failed, necessitating an unanticipated third hot tap and line stop. Both the prime contract and the subcontract provided that TEAM would perform a double hot tap and line stop. TEAM was unable to complete the second line stop, resulting in InterCon having to perform additional prep work for a third hot tap and line stop. Although TEAM

---

[23] ***Reilly Constr. Co. v. Bachelder, Inc.***, No. 14-0817, 2015 WL 1331634, at *6 (Iowa Ct. App. 2015) (quoting ***Ideal Heating Co. v. Kramer***, 102 N.W. 840, 840-41 (Iowa 1905)); *see also* **17A Am. Jur. 2d** *Contracts* **§ 599** (Westlaw, Aug. 2022) (no breach of the implied duty to perform work in a workmanlike manner if "the contractor performed the work in accordance with industry standards").

eventually completed two hot taps and line stops, the parties had intended for TEAM to complete its work at two designated spots (which TEAM did not do).

In addition, although the subcontract did not specifically state that TEAM had to complete its work in a specific amount of time, it did provide that TEAM had to "completely and satisfactory perform the Work in accordance with the Schedule." As I have already discussed, delays by InterCon resulted in TEAM's work beginning behind schedule. But the schedule contemplated that whenever TEAM's work began, it would take place over seven days: two days for TEAM to perform the hot tap, a day for InterCon to work, a day for TEAM to perform the line stop, two days for InterCon to work, and a day for TEAM to remove the line stop equipment. In actuality, here, it took TEAM a day to perform the hot tap and a half day to perform the first line stop and attempt the second, but then InterCon had four and a half days of additional prep work as a result of the failed line stop; and once the crew returned from the holiday break, TEAM and InterCon worked a little more than three and a half days to reach substantial completion. Thus, as a result of the failed line stop, the hot tap and line stop work (including InterCon's work that depended on it) took nine and a half days, rather than the seven days set out in the schedule. This lends further support that TEAM breached the subcontract when it could not complete the second line stop on December 16.

TEAM argues that the doctrine of impossibility excuses any breach (as I found that TEAM followed industry standards and could not have prevented the damage to the sandwich valve). "The doctrine of impossibility . . . excuse[s] . . . nonperformance generally where that which has been promised becomes *objectively* impossible to perform due to no fault of the nonperforming party."[24] But "[i]mpossibility is not a defense" based on a "contingency that reasonably may have been anticipated" but that "was not

---

[24] ***Nora Springs Co-op. Co. v. Brandau***, 247 N.W.2d 744, 747 (Iowa 1976).

provided for in the contract."[25]   Here, TEAM could have included language in the contract that it bore no responsibility for delays outside its control or for damages caused by hot tap shavings—as stated in TEAM's bid.  The impossibility doctrine does not apply because the parties reasonably could have anticipated a line stop and sandwich valve failure and included language in the contract excusing TEAM from liability, but they did not.

> [C]ontract liability is strict liability.  The obligor is therefore liable in damages for breach of contract even if he is without fault and even if circumstances have made the contract more burdensome or less desirable than he had anticipated.  The obligor who does not wish to undertake so extensive an obligation may contract for a lesser one.[26]

Therefore, InterCon proved that the failed line stop constituted a breach of contract—even though TEAM was without fault.

---

[25] *Yager v. Farmers' Mut. Tel. Co.*, 323 N.W.2d 245, 249 (Iowa 1982); *accord* **Iowa Model Civil Jury Instructions § 2400.9**; *see also Household Fin. Indus. Loan Co. of Iowa v. Rasmus*, No. 12-1527, 2013 WL 5949677, at *14 (Iowa Ct. App. Nov. 6, 2013) (noting that the Restatement provides that the impossibility doctrine usually requires "the occurrence of a supervening event" attributable to 'acts of God' or to 'acts of third parties,' not an event "caused by the obligee").

[26] *Mel Frank Tool & Supply, Inc. v. Di-Chem Co.*, 580 N.W.2d 802, 805-06 (Iowa 1998) (cleaned up) (quoting **Restatement (Second) of Contracts ch. 11 introductory note** (1981)).  I note that in *Gehrke, Inc. v. Steeple Chase Farms, LLC*, No. 15-0601, 2016 WL 156025, at *10 (Iowa Ct. App. Jan. 13, 2016), the Iowa Court of Appeals affirmed the trial court's conclusion resolving plaintiff's breach-of-contract claim based on its negligence finding that defendant's construction work met the standard of care.  The court noted agreement "under the specific circumstances of this case."  *Id.*  In that case, after the defendant subcontractor performed its excavating work, another subcontractor poured concrete in the excavated pit, which ended up being ruined after a rainstorm.  *Id.* at *2-4.  Plaintiff (the general contractor) blamed the subcontractor for failing to adequately "berm" the pit.  *Id.* at *4.  Whether the subcontractor performed its excavation work unreasonably for purposes of the negligence claim (and was thus responsible for the flooding) was thus the same issue as whether the subcontractor's workmanship was defective for purposes of the breach-of-contract claim.  *Id.* at *10-11.  The breach of contract here is not based on TEAM's *completion* of the line stop in an unworkmanlike manner but rather, the *failure to complete* the second line stop (and the resulting longer length of time required to perform the hot tap and line stop work).  *Gehrke* is distinguishable.

23

### B. Damages

After a breach of contract, the nonbreaching party is generally entitled to "benefit of the bargain" damages, which place the nonbreaching party "in as good a position" (but not better) as the nonbreaching party "would have occupied had the contract been performed" without a breach.[27] "[D]amages based on breach of contract must have been foreseeable or have been contemplated by the parties when the parties entered into the agreement."[28]

> Whether the damages were reasonably anticipated by the parties when the contract was formed may be discerned from 'the language of the contract in the light of the facts, including the nature and purpose of the contract and circumstances attending its execution.' Damages which a reasonable person would expect to follow from breach of a contract . . . should be awarded.[29]

Breach-of-contract damages must also "have some nexus with the breach, i.e., the damages recoverable for a breach of contract are limited to losses actually suffered by reason of the breach and must relate to the nature and purpose of the contract."[30]

Here, InterCon seeks more than $200,000 in damages. It seeks to recover its labor costs paid to workers the week of December 18 when performing the additional prep work for the unexpected third hot tap and line stop (including the salary of the foreman). InterCon also requests TEAM cover labor costs incurred over the holiday break and the first week of January, when NNG prevented construction on the project due to the cold weather. In addition, InterCon seeks overhead costs and for TEAM to pay for the "cost" of equipment owned by InterCon that was on site during the extra work and holiday

---

[27] ***Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.***, 579 N.W.2d 823, 831 (Iowa 1998).

[28] ***Kuehl v. Freeman Bros. Agency, Inc.***, 521 N.W.2d 714, 718 (Iowa 1994).

[29] ***Id.*** (quoting **22 Am. Jur. 2d** *Damages* **§ 460** (1988)).

[30] ***Royal Indem. Co. v. Factory Mut. Ins. Co.***, 786 N.W.2d 839, 847 (Iowa 2010).

break.[31]  InterCon also seeks recovery based on rental equipment from third parties.

As an initial matter, I conclude that InterCon's damages are limited to those incurred the week of December 18.  As discussed in the preceding section, there is no credible evidence that either the prime contract or subcontract set a substantial-completion deadline of December 22.  Nor is there evidence that TEAM knew when entering the contract that the project would be shut down over the holidays.  And if InterCon's work had not delayed TEAM's start date, TEAM would have completed its work by December 22—even with the failed line stop.  That TEAM would be responsible for all the project's costs incurred over the holiday break because the line stop failed was not foreseeable or within the reasonable contemplation of the parties at the time of contracting.

For the same reasons, costs incurred on the project the week of January 3 were not foreseeable.  NNG unilaterally decided to pause the project the week of January 3 because of cold weather and concerns of how an outage might affect its customers.  Per the prime contract, NNG was responsible for costs incurred due to delays it caused.  And indeed, InterCon sought to recover these costs from NNG, but NNG denied the change order.  InterCon chose not to bring suit against NNG and cannot now recover these costs from TEAM.

InterCon is entitled to damages for the week of December 18, however.  When TEAM failed to complete the second line stop as agreed, InterCon had to perform additional prep work to ready a third, unexpected location on the pipeline for the second hot tap and line stop.  InterCon completed this work from Monday, December 18 through Friday, December 22 at 11:00 a.m.[32]  It was foreseeable at the time of contracting that a

---

[31] I found that InterCon did not offer credible evidence of these costs.

[32] InterCon seeks labor and other costs for two hours of work on Saturday, December 16.  The crew was sent home at 3:00 p.m. and only paid for the time they were on site, so InterCon did not incur any additional labor costs for sending the crew home early.  To the extent InterCon seeks payment from TEAM for time spent troubleshooting the failed line stop the afternoon of December 16, I do not find that TEAM's breach occurred until troubleshooting failed to resolve the problem.  Thus, InterCon is not entitled to any damages related to December 16.

Case 6:18-cv-02081-KEM   Document 72   Filed 11/04/22   Page 25 of 31

failed line stop and sandwich valve would require a third hot tap and line stop. It was also foreseeable that InterCon would incur additional costs as a result of an unexpected third hot tap and line stop. TEAM must pay InterCon damages for the work performed from December 18 through December 22 to ready the new location for a hot tap and line stop.[33]

InterCon seeks labor costs (for salaried and non-salaried union employees), overhead, costs related to the use of equipment it owned, and costs related to rental equipment. In the contract, InterCon waived the right to recover "special, indirect, punitive or consequential damages resulting from or arising out of [the subcontract], including, without limitation, loss of profit or business interruptions including loss or delay of operations, however caused." TEAM agreed to pay InterCon for actual or direct damages caused by delay, however.

Iowa courts do not appear to have assigned a definition to indirect or consequential damages outside the context of the Uniform Commercial Code. Black's Law Dictionary defines consequential damages (also termed indirect damages) as "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act"; examples include loss of goodwill and profits.[34] As one court has explained:

> "Rather than turning on foreseeability [which is a limit on all contract damages], the difference between direct and consequential damages depends on whether the damages represent (1) a loss in value of the other party's performance, in which case the damages are direct, or (2) collateral losses following the breach, in which case the damages are consequential." "Direct damages refer to those which the party lost from the contract itself—in other words, the benefit of the bargain—while consequential damages refer to economic harm beyond the immediate scope

---

[33] I do not find that TEAM must pay wait time or wages related to the afternoon of December 22—upon the return to the job site in January, the crew worked a full day, suggesting that without the holiday break, TEAM's hot tap and line stop work could have proceeded on the afternoon of December 22 and InterCon would not have incurred any wait-time costs.

[34] **Damages, Black's Law Dictionary** (11th ed. 2019).

of the contract." . . . So direct damages are the costs of a plaintiff getting what the defendant was supposed to give—the costs of replacing the defendant's performance. Other costs that the plaintiff may not have incurred if the defendant had not breached, but that are not part of what the plaintiff was supposed to get from the defendant, are consequential.[35]

In the specific context of construction contracts, courts have recognized (for purposes of determining how to calculate indirect costs):

> Bids on construction projects incorporate two different kinds of costs. The first type, direct costs, include construction wages and equipment expenses and are attributed to specific projects. The second type, indirect costs, are the expenses involved in generally running a business, not attributable to any one project. The most significant indirect cost is home office overhead. Such costs typically include salaries of executive or administrative personnel, general insurance, rent, utilities, telephone, depreciation, professional fees, legal and accounting expenses, advertising, and interest on loans.[36]

Iowa courts have made clear that lost profits are consequential damages[37] (and thus barred by the damages waiver here).

Here, the additional labor wages InterCon paid to the hourly employees under union contracts are clearly direct costs and totaled $30,689.02. A closer issue is whether the project's foreman's salary constitutes direct or consequential damages. On the one hand, the foreman's salary can be attributed to this specific construction project, such

---

[35] *Jay Jala, LLC v. DDG Constr., Inc.*, No. CV 15-3948, 2016 WL 6442074, at *1-3 (E.D. Pa. Nov. 1, 2016) (quoting *Atl. City Assocs., LLC, v. Carter & Burgess Consultants, Inc.*, 453 F. App'x 174, 179 (3d Cir. 2011)).

[36] *Complete Gen. Constr. Co. v. Ohio Dep't of Transp.*, 760 N.E.2d 364, 368 (Ohio 2002) (citing *Interstate Gen. Gov't Contractors, Inc. v. West*, 12 F.3d 1053, 1058 (Fed.Cir.1993)).

[37] *Optimal Interiors, LLC v. HON Co.*, 774 F. Supp. 2d 993, 1008, 1012-13 (S.D. Iowa 2011) (holding that damages waiver "for special, incidental or consequential damages including, without limitation, lost profits or revenues" precluded ability to recover any lost profits, as "lost profits are routinely regarded as consequential damages and not as direct damages" under Iowa law); *see also, e.g.*, *Car Wash Consultants, Inc. v. Belanger, Inc.*, No. 08-1195, 2009 WL 3775101, at *5 (Iowa Ct. App. Nov. 12, 2009) ("Lost profits are a form of consequential damages.").

that InterCon considers it a direct cost (rather than overhead) when determining its bid—and indeed, InterCon's contract with NNG set out rates NNG had to pay to cover the foreman's labor for any delays. And the foreman's salary could be viewed as part of InterCon's "replacement" costs for TEAM's breach—to put InterCon in the position it would have been absent the failed line stop, the foreman had to work four and a half extra days. On the other hand, as a salaried employee, InterCon would have paid the foreman's wages whether or not he was working on a project. There is no evidence of the foreman's next project or whether it was impacted by the four-and-a-half-day delay: Was the foreman's next project set for February, such that the foreman had wait time in between projects (during which he still would have been paid by InterCon)? If that were the case, the foreman's work was not impacted by the delay and InterCon incurred no additional costs as a result. Even if the foreman's next project started immediately after this one, what additional costs did InterCon incur as a result of the four-and-a-half day delay? It seems like simply a "delay of operations"—InterCon not being able to use the foreman on the next project until four-and-a-half days later than anticipated. The waiver precludes "indirect . . . damages resulting from . . . delay of operations, however caused." Under the specific circumstances of this case, I conclude that the waiver precludes recovery based on the foreman's salary.

InterCon seeks its overhead costs, which under any definition, are indirect or consequential damages precluded by the waiver.[38] InterCon also seeks costs related to the equipment it owned on the job site. If InterCon had offered evidence of the additional gas needed to power the equipment during the extra work (for example), that would have been evidence of a direct cost. But instead, InterCon seeks payment for the equipment

---

[38] *See also **Complete Gen.***, 760 N.E.2d at 368 (describing overhead costs as consequential); ***ITT Water & Wastewater USA, Inc. v. L D'Agostini & Sons, Inc.***, No. 328128, 2016 WL 1072632, at *2 (Mich. Ct. App. Mar. 17, 2016) (per curiam) (describing overhead costs as indirect); ***Sullivan v. City of Baton Rouge***, 170 So. 3d 186, 202-03 (La Ct. App. 2015) (same).

on the job site on an hourly basis during the four-and-a-half-day delay, whether or not the equipment was used during the delay. InterCon *owns* this equipment. It did not pay any additional money as a result of the four-and-a-half-day delay for equipment that was not even used during the delay. At trial, InterCon's CFO claimed that but for the delay, it would have used the equipment on a different project (there is no evidence of any specific project), and he posited that InterCon may have even been able to avoid rental expenses for the same equipment on the other project. He could not adequately explain how these costs differ from lost profits or overhead. Although InterCon may consider the hourly equipment costs a direct cost for purposes of its internal accounting, like the foreman's salary, I find that the equipment costs are indirect damages seeking recovery based on the delay of operations. Therefore, the waiver precludes damages for the hourly equipment "costs."

InterCon also requests payment based on rental equipment on the job site. For both rented air compressors and mats, InterCon's initial rental period (for a month) included the week of December 18. Thus, InterCon did not incur any additional costs to keep this equipment onsite while the additional prep work was being performed. And even if InterCon extended these rental contracts for an additional month as a result of all the delays (InterCon offered no evidence to this effect), the extended rental period would have run through the end of January—meaning InterCon would have paid for the rentals regardless of the four-and-a-half-day delay. InterCon did not incur any greater rental expenses for air compressors and mats as a result of TEAM's breach.

InterCon also rented light towers from November 20, 2017, through December 18, 2017, which InterCon then extended through January 15. *Id.* It is unclear what parts of the project required the use of the light towers and whether InterCon extended this rental beyond January 15. Like the air compressors and mats, InterCon may have needed to extend the light tower rental regardless of TEAM's breach and the four-and-a-half-day delay. I do not find that InterCon has proved that it suffered losses attributable to the breach based on the light tower rentals.

Finally, InterCon seeks damages based on the additional supplies needed for a third hot tap and line stop—namely, a third sandwich valve fitting. After TEAM's sandwich valve failed, NNG provided a new fitting, but it withheld $13,119.99 in payment from the contract price, essentially charging InterCon for the materials. This is a direct, foreseeable cost incurred as a result of TEAM's breach; had TEAM's line stop and sandwich valve not failed, NNG would not have needed to supply a new sandwich valve, and NNG would have paid InterCon an additional $13,119.99 on the contract. Thus, InterCon is entitled to $13,119.99 to pay for the sandwich valve.

In sum, InterCon's direct, foreseeable costs as a result of TEAM's breach include $30,689.02 in labor damages and $13,119.99 in materials ($43,809.01 total). InterCon expected to pay TEAM $29,450 for its work under the contract, but it withheld payment, so the contract price should be deducted from InterCon's additional costs to place InterCon in the position it would have been in but for TEAM's breach. InterCon is therefore entitled to $14,359.01 in damages for TEAM's breach-of-contract.

### C. Contractual Indemnification

InterCon also brought a claim for contractual indemnification. Doc. 1; Doc. 66 at 18-19. InterCon relies on the following clause of the subcontract:

> [TEAM] shall defend and indemnify [InterCon], [NNG] and other indemnified parties against, and save them harmless from, any and all loss, damage, costs, expenses, and reasonable attorneys' fees suffered or incurred on account of any breach of the aforesaid obligations and covenants, and any of the provisions or covenant of this Agreement to the extent such occurred due to [TEAM's] negligence or willful misconduct. Notwithstanding the above, [InterCon], at its sole discretion, reserves the right to defend any one or all of the following: [NNG], other indemnified parties, [InterCon's] surety and itself. Such election to defend by [InterCon] shall not in any way limit [TEAM's] responsibility to indemnify and hold harmless as provided herein.

Ex. 5 at 8.

The Iowa Supreme Court has "held that indemnification clauses that use the terms 'indemnify' and 'hold harmless' evidence the parties' intent to protect a party from claims brought by third parties"; it does not apply in lawsuits between the parties to the contract.[39] As such, InterCon cannot rely on the indemnification provision.[40] Accordingly, I find for TEAM on InterCon's indemnification claim.

## III. CONCLUSION

I find for InterCon on its breach-of-contract claim and award $14,359.01 in damages. I find for TEAM on InterCon's contractual indemnification claim. The clerk of court is directed to enter judgment accordingly.

**SO ORDERED** on November 4, 2022.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

[39] *Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 708 (Iowa 2020); *see also Est. of Pearson v. Interstate Power & Light Co.*, 700 N.W.2d 333, 344-45 (Iowa 2005).

[40] *Id.*; *see also Standard Water Control Sys., Inc. v. Jones*, 888 N.W.2d 673, 678 (Iowa Ct. App. 2016) ("An indemnification clause 'does not apply to claims between the parties to the agreement. Rather it obligates the indemnitor to protect the indemnitee against claims brought by persons not a party to the provision.'" (quoting *FNBC Iowa, Inc. v. Jennessey Grp., LLC*, 759 N.W.2d 808, 811 (Iowa Ct. App. 2008))).